# Illinois Official Reports

## Appellate Court

---

### *Keiser-Long v. Owens*, 2015 IL App (4th) 140612

---

| | |
|---|---|
| Appellate Court Caption | CAROL KEISER-LONG, Plaintiff-Appellant, v. KIRK OWENS, Defendant-Appellee. |
| District & No. | Fourth District<br>Docket No. 4-14-0612 |
| Filed | July 30, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 10-L-19; the Hon. Jeffrey B. Ford, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, and Elizabeth Felt Wakeman (argued) and Alex C. Wimmer, both of Botto Gilbert Gehris Lancaster, P.C., both of Crystal Lake, for appellant.<br><br>Craig L. Unrath and Brad A. Elward (argued), of Heyl, Royster, Voelker & Allen, of Peoria, and Daniel P. Wurl, of Heyl, Royster, Voelker & Allen, of Urbana, for appellee. |
| Panel | JUSTICE HOLDER WHITE delivered the judgment of the court, with opinion.<br>Justices Knecht and Steigmann concurred in the judgment and opinion. |

**OPINION**

¶ 1    In November 2013, plaintiff, Carol Keiser-Long, filed her third amended complaint against defendant, Kirk Owens, alleging defendant, through his negligent and willful and wanton conduct, caused her to suffer damages. In her complaint, plaintiff sought, in part, damages for her "lost earning capacity and lost earning potential."

¶ 2    In March 2014, the cause proceeded to trial. At the close of the evidence, defendant moved for a directed finding on the issue of damages for lost earning capacity and potential. The next day, the trial court granted defendant's motion for a directed finding. Thereafter, the matter was submitted to the jury, which returned a verdict in favor of plaintiff and awarded damages. Later that month, plaintiff filed a motion to reconsider the court's directed finding. In June 2014, the court entered a written order denying plaintiff's motion to reconsider.

¶ 3    Plaintiff appeals, arguing the trial court erred by granting defendant's motion for a directed verdict where (1) Illinois law allows for the recovery of all damages which flow from a negligent act, and (2) the court misapplied the law regarding her claim for lost earning capacity. We reverse and remand for further proceedings.

¶ 4                                    I. BACKGROUND

¶ 5    In August 2008, plaintiff and defendant were involved in an automobile accident in rural Tolono Township in Champaign County, Illinois. Defendant's vehicle collided with plaintiff's when he disobeyed a stop sign and entered an intersection without yielding to plaintiff's right of way. Plaintiff later discovered defendant was intoxicated when his vehicle collided with hers and had pleaded guilty to driving under the influence of alcohol.

¶ 6    In November 2013, plaintiff filed her two-count third amended complaint. In count I, plaintiff alleged defendant's conduct was negligent. In count II, she alleged his conduct was willful and wanton. The complaint sought, in part, damages for plaintiff's "lost earning capacity and lost earning potential."

¶ 7    In February 2014, prior to the commencement of the jury trial, defendant admitted liability on count I (negligence). Accordingly, in March 2014, the matter proceeded to trial on count II, as well as the issue of damages.

¶ 8    At trial, plaintiff testified she was self-employed and always had been. She is the sole shareholder of two corporations, C-Bar Cattle Company, Inc. (C-Bar), and C-Arc Enterprises, Inc. (C-Arc). C-Arc is a consulting business. C-Bar is a cattle-brokering business, which buys and sells cattle for profit. All of plaintiff's cattle business runs through C-Bar and any revenue received from the sale of cattle is deposited into C-Bar's bank accounts. Plaintiff never received a formal salary or bonus from C-Bar or C-Arc; however, she was able to freely transfer money from their accounts. Additionally, plaintiff routinely provided substantial shareholder loans to C-Bar. Since 2006, neither C-Bar nor C-Arc has had an employee other than plaintiff. Both C-Bar and C-Arc are C corporations as opposed to subchapter-S corporations.

¶ 9    Plaintiff testified the accident negatively affected her cattle business. She was unable to make any decisions regarding the business because she was in severe pain. Further, her cattle business required her to drive all over the Midwest, visiting feedlots and auctions. The accident had caused her to experience anxiety when she was in a car to the point she could not drive to

feedlots and auctions as she had before. In the years following the accident, plaintiff did not go to the feedlots as she had in the past because she had not purchased any cattle. Further, plaintiff was unable to maintain her relationships with the feedlots she had used despite their importance in running a profitable cattle operation. According to plaintiff, she missed the opportunity to earn money in the cattle business following the accident.

¶ 10    Larry Joe O'Hern testified on behalf of plaintiff. O'Hern and plaintiff were business partners between 2000 and 2008. Plaintiff would buy a 50% interest in his "commercial cow-calf calves" and arrange to have them fed in Nebraska or Kansas. Contacts and relationships are instrumental in getting cattle into the right feedlots to maximize earnings. Additionally, it is important for those in the business to visit the feedlots to ensure the cattle are being taken care of properly.

¶ 11    According to O'Hern, plaintiff owned between 3,000 and 5,000 head of cattle each year. O'Hern testified, in 2008, he and plaintiff stopped doing business together. Plaintiff did not purchase any cattle with him from 2008 to 2012. O'Hern testified the accident had a substantial impact on plaintiff's ability to participate in the cattle business but was unable to state what effect the accident had on her personal earnings.

¶ 12    According to O'Hern, 2009 and 2010 were great years to be in the cattle business: "we had some [$200 per] head profits." Using plaintiff's typical inventory of 3,000 or 4,000 head and a conservative profit estimate of $50 per head, O'Hern opined plaintiff lost the opportunity to make approximately $200,000 per year in the years following the accident. However, at his deposition, O'Hern did not have an opinion as to any specific amount of income plaintiff lost as a result of the accident.

¶ 13    Plaintiff's husband, Ewell "Woody" Long, testified about her participation in the cattle business following the accident. Before the accident occurred, plaintiff was on the phone for "two or three hours [per day], three or four times a week." Additionally, she would visit the feedlots seven or eight times per year. Since the accident, plaintiff stopped buying and selling cattle as frequently as she had before. She had only visited a feedlot once. Further, she seemed to have lost interest and motivation to participate in the business. According to Long, this resulted from plaintiff's fear of driving, which was caused by the accident.

¶ 14    Roger Colmark testified he had been plaintiff's accountant for at least 10 years. During that time, he prepared plaintiff's personal tax return, as well as the return for C-Bar and C-Arc, which file jointly. Additionally, after plaintiff married Long, Colmark prepared the couple's joint tax return.

¶ 15    Colmark testified respondent does not take a salary out of C-Bar because it would deplete C-Bar's retained earnings. In the case of C-Bar, retained earnings are the profit from the sale of cattle which has been left in the corporation instead of being paid out as salary to plaintiff. Because plaintiff is the sole shareholder of C-Bar, its retained earnings belonged only to her. According to Colmark, plaintiff treats C-Bar's retained earnings as a 401(k), and he would "assume after she retires she will take the–start to take the income out of this."

¶ 16    Colmark also testified as to the significance of C-Bar and C-Arc's corporate form. According to Colmark, a C corporation "is normally called a regular corporation," and any income is taxed at the corporate level. In a subchapter-S corporation, on the other hand, the corporation's profit or loss flows through the owner's personal income tax return.

¶ 17 At the close of the evidence, defendant moved for a directed verdict as to the issue of plaintiff's claim for lost earning capacity. Defendant asserted plaintiff had presented evidence only of the possible losses sustained by C-Bar and C-Arc, and not plaintiff personally. Defendant relied on the fact plaintiff never drew a salary from her corporations to support his claim plaintiff had not shown she had personally suffered loss. Defendant also noted C-Bar and C-Arc were not subchapter-S corporations, and therefore, any profit or loss did not flow through plaintiff individually.

¶ 18 The next day, after giving plaintiff an opportunity to respond, the trial court granted defendant's motion for a directed verdict. The case was thereafter submitted to the jury, who returned a verdict in favor of plaintiff on count II and awarded damages on both counts.

¶ 19 In April 2014, plaintiff filed a motion to reconsider the trial court's finding with regard to defendant's motion for a directed verdict. Plaintiff's motion did not request a new trial on the issue of damages or attack the judgment entered on the jury's verdict. In June 2014, the court denied plaintiff's motion.

¶ 20 This appeal followed.

¶ 21 II. ANALYSIS

¶ 22 On appeal, plaintiff argues the trial court erred by granting defendant's motion for a directed verdict where (1) Illinois law allows for the recovery of all damages which flow from a negligent act, and (2) the court misapplied the law regarding her claim for lost earning capacity. Before addressing the merits, however, we must first address our jurisdiction to consider plaintiff's appeal.

¶ 23 A. Jurisdiction

¶ 24 Defendant contends this court lacks jurisdiction because plaintiff's motion to reconsider was an "improper" posttrial motion due to its failure to request a new trial or attack the judgment on the verdict. Consequently, defendant argues, the posttrial motion did not toll the time for filing a notice of appeal and, therefore, plaintiff's appeal was untimely.

¶ 25 Whether a court has jurisdiction is a question of law we review *de novo*. *Yunker v. Farmers Automobile Management Corp.*, 404 Ill. App. 3d 816, 821, 935 N.E.2d 630, 635 (2010). In *Keen v. Davis*, 38 Ill. 2d 280, 282, 230 N.E.2d 859, 861 (1967), the supreme court held no posttrial motion is necessary when the trial court directs a verdict. This is so because "[w]hen a judge directs a verdict at any stage of the trial, in effect, he has removed the case from the realm of the rules relating to jury cases and the rules applicable to bench trials should apply. It seems illogical to require a party to address the same arguments to the same judge on the identical questions before proceeding to review by an appellate tribunal." *Larson v. Harris*, 77 Ill. App. 2d 430, 434, 222 N.E.2d 566, 568 (1966).

¶ 26 In this case, the trial court directed a verdict in defendant's favor as to the issue of plaintiff's lost earning potential and capacity. Under *Keen*, therefore, plaintiff was not required to file a "proper" posttrial motion–*i.e.*, one requesting a new trial–to preserve her issue for appeal, and her motion to reconsider's failure to request a new trial is not fatal. In any event, we find plaintiff's motion to reconsider *necessarily* requests a new trial given the fact a favorable ruling on the motion would have required the trial court to put the issue of plaintiff's lost earning capacity back before the jury.

¶ 27 Here, the trial court entered judgment on March 14, 2014. On April 14, 2014, plaintiff timely filed her motion to reconsider the trial court's directed finding, which tolled the time for appeal until 30 days following the order disposing of her motion to reconsider. Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008). On June 4, 2014, the trial court entered its written order denying plaintiff's motion to reconsider. On July 2, 2014, 28 days later, plaintiff filed her notice of appeal. Accordingly, we have jurisdiction over plaintiff's appeal.

¶ 28                                    B. The Trial Court Improperly Granted
                                       Defendant's Motion for a Directed Verdict

¶ 29 Plaintiff argues the trial court erred by granting defendant's motion for a directed verdict, removing the issue of her lost earning capacity from the province of the jury. Specifically, plaintiff asserts Illinois law allows for the recovery of all damages which flow from a negligent act. Further, plaintiff contends, the court misapplied the law when it distinguished plaintiff's corporations "from those in cases where lost shareholder corporate earnings were allowed as damages."

¶ 30                                      1. *Standard of Review*

¶ 31 A motion for a directed verdict should be granted "only in those cases in which all of the evidence, when viewed in its aspect most favorable to the [nonmoving party], so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). The plaintiff must present some evidence on every essential element of the cause of action; otherwise, the defendant is entitled to a judgment in his favor as a matter of law. *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 123, 806 N.E.2d 645, 660 (2004). We review *de novo* the ruling on a motion for a directed verdict, meaning we perform the same analysis as the trial court. *Harris v. Thompson*, 2012 IL 112525, ¶ 15, 976 N.E.2d 999.

¶ 32                                      2. *The Sezonov Case*

¶ 33 The parties both cite to *Sezonov v. Wagner*, 274 Ill. App. 3d 511, 654 N.E.2d 252 (1995), to support their contentions on appeal. In *Sezonov*, the plaintiffs, a husband and wife, were the sole shareholders and officers of their corporation, Sparrow, Inc. (Sparrow), which owned and operated one pet store and was about to open another one when the husband was involved in a car accident with the defendant. *Id.* at 512, 654 N.E.2d at 253. The plaintiffs filed a complaint, seeking, in part, damages for the loss of sales and earnings caused by a delay in opening the second store, which resulted from the husband's inability to work. *Id.* at 511, 654 N.E.2d at 253. The plaintiffs presented evidence the second store lost net profits of $21,000 because of the delay in opening. *Id.* at 512, 654 N.E.2d at 254. The defendant filed a motion for summary judgment, asserting the plaintiffs were not entitled to relief because the pet store was owned and operated by Sparrow as opposed to the plaintiffs. *Id.* at 513, 654 N.E.2d at 254. The trial court granted the defendant's motion and certified the following question for appeal pursuant to Illinois Supreme Court Rule 308(a) (eff. Feb. 1, 1994): "whether plaintiffs [were] barred from presenting evidence for a claim of the lost profits or expenses incurred because of a 43-day delay in opening a new pet store, when the delay was caused by [the husband's] inability to work and the pet store was owned by an Illinois corporation of which [the plaintiffs

were] the sole shareholders and officers." *Sezonov*, 274 Ill. App. 3d at 511-12, 654 N.E.2d at 253.

¶ 34 On appeal, the Second District answered the certified question in the negative, defining the scope of the plaintiffs' recovery as follows:

"Plaintiffs are not seeking to recover for all losses Sparrow incurred because of [the husband's] incapacity, only those which are the direct result of [the husband's] inability to work. If plaintiffs can prove that the [second] store was unable to open timely because [the husband] was unable to supervise the installation of the fish department and to hire temporary help, then they can recover damages from the late opening. *However, plaintiffs can recover only that money which they personally would have received from the corporation, i.e., the earnings or wages lost.*" (Emphasis added.) *Id.* at 514, 654 N.E.2d at 255.

In other words, the *Sezonov* court held a corporation's lost profits may be relevant to its shareholder's claim for lost earnings but only to the extent the owner would have personally received income from the corporation.

¶ 35 Here, defendant places significance in the fact plaintiff never received a salary or bonus from C-Bar, citing to the *Sezonov* court's limitation on damages to the money plaintiff would have received from the corporation, *i.e.*, the earnings or wages lost. However, *Sezonov* involved a claim for lost earnings and sales as opposed to, as we have here, a claim for lost earning capacity and is therefore inapposite. See *Buckler v. Sinclair Refining Co.*, 68 Ill. App. 2d 283, 294, 216 N.E.2d 14, 20 (1966) (Damages for lost earning capacity are distinct from those for lost earnings or wages.). Therefore, we find the fact plaintiff never received a salary or wage from C-Bar did not bar the jury from considering her claim for lost earning capacity.

¶ 36                                 *3. Lost Earning Capacity*

¶ 37 In Illinois, "[a] plaintiff is entitled to recover all damages which naturally flow from the commission of the tort." *Kritzen v. Flender Corp.*, 226 Ill. App. 3d 541, 557, 589 N.E.2d 909, 921 (1992). A plaintiff's impaired earning capacity is a proper element of damages to be considered by the trier of fact. *Robinson v. Greeley & Hansen*, 114 Ill. App. 3d 720, 726, 449 N.E.2d 250, 254 (1983). "Recovery, however, must be limited to such loss as is reasonably certain to occur." *Id.* Generally, these damages are measured by the difference between the amount the plaintiff was capable of earning before his or her injury and that which he or she is capable of earning after the injury. *Id.* "Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury, and the difference in the actual earnings of plaintiff before and after the injury does not constitute the measure." *Id.* This is not to say the plaintiff's actual pre- and post-injury earnings are irrelevant to the measure of damages but, rather, they "may be helpful to a jury in its determination of the impairment of ability to earn." *Id.*

¶ 38 The determination of lost earning capacity becomes more complicated where, as here, the plaintiff is self-employed. *Id.* In *Robinson*, the appellate court explained the loss of earning capacity in this context as follows:

"Generally, earnings which are derived from the combination of capital and labor should not be considered in determining the diminution of earning capacity. [Citation.] However, it has also been held that a jury may properly consider the profits which have

been derived from [the] plaintiff's management of or activity in a business, as distinguished from profits derived from invested capital." *Id.* at 726, 449 N.E.2d at 254-55.

The *Robinson* court determined the trial court properly excluded evidence of the plaintiff's wrecking company's income where "the predominating factor of plaintiff's wrecking company is the investment of significant capital, as well as the use of the labor of others in performing critical functions." *Id.* at 727, 449 N.E.2d at 255.

¶ 39    Comment c to section 924 of the Restatement (Second) of Torts lends support to the *Robinson* court's statement of the law regarding the loss of earning capacity to a self-employed plaintiff, stating as follows:

"When the injured person was not receiving a salary, but owned and was operating a business that was deprived of his services by the injury, his damages are the value of his services in the business during the period. If his services, rather than the capital invested or the services of others, were the predominant factor in producing the profits, evidence of the diminution of profits from the business will be received as bearing on his loss of earning capacity." Restatement (Second) of Torts § 924 cmt. c (1979).

¶ 40    In this case, plaintiff presented evidence C-Bar's profits were derived solely from her management of and activity in the business. Plaintiff presented evidence she was the sole employee of C-Bar. To maximize C-Bar's earnings, plaintiff had to be personally involved in the cattle-buying process by visiting cattle auctions to determine which cattle she should buy. Further, plaintiff had to form and maintain relationships with feedlots. Once she purchased cattle, she had to visit the feedlots to ensure they were being taken care of properly.

¶ 41    Plaintiff also presented evidence her business would not be as profitable if she could not perform all these duties. To perform these duties, plaintiff was required to drive to various locations all over the Midwest. As a result of the accident, however, plaintiff experienced great anxiety while driving, to the extent she would not drive at night or in new areas.

¶ 42    Plaintiff also presented evidence she missed the opportunity to earn money in the cattle business following the accident. O'Hern testified plaintiff lost the opportunity to earn profits in the amount of $200,000 per year following the accident based on plaintiff's previous annual inventory of 3,000 to 5,000 head of cattle and a conservative profit estimate of $50 per head.

¶ 43    Finally, plaintiff presented evidence C-Bar's profit from the sale of cattle was placed in the corporation's retained earnings. She treats C-Bar's retained earnings as her retirement plan. No one had access to the retained earnings other than plaintiff, as she was the sole shareholder of C-Bar. Additionally, plaintiff freely transferred money out of the corporate accounts and provided substantial shareholder loans to the corporation on several occasions.

¶ 44    Given the evidence C-Bar's profits were derived solely from plaintiff's management and activity in the business, we conclude the diminution in C-Bar's profits was relevant to the jury's determination of plaintiff's lost earning capacity. The fact plaintiff failed to present evidence she personally lost income in the form of a salary or bonus from her cattle-feeding operation is of no consequence. See *Robinson*, 114 Ill. App. 3d at 726, 449 N.E.2d at 254-55; Restatement (Second) of Torts § 924 cmt. c (1979). To the extent *Sezonov* holds otherwise, we decline to follow the holding of that case. See *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440, 892 N.E.2d 994, 1006-07 (2008) (appellate court is not bound by the decisions of equal or inferior courts). Rather, it is apparent plaintiff is akin to C-Bar's alter

ego. Further, based on the evidence presented, a jury could have reasonably returned a verdict in favor of plaintiff for her lost earning capacity.

¶ 45 Defendant contends the trial court's decision must be affirmed where plaintiff failed to offer evidence she *personally* suffered a loss of earning potential. In this case, defendant argues, plaintiff showed only C-Bar suffered a loss as a result of her inability to work. He notes C-Bar and C-Arc are C corporations, as opposed to subchapter-S corporations, meaning the profits and losses do not flow through the individual shareholder, plaintiff. Under the circumstances presented in this case, we find little significance in the fact C-Bar and C-Arc were incorporated as C corporations as opposed to subchapter-S corporations. The only significant difference between the two corporate forms is how each corporation's income is taxed–the income derived by a C corporation is taxed at the corporate level, and any distribution of that income to shareholders is taxed to the shareholder individually, whereas in a subchapter-S corporation, the corporation's income is taxed to the shareholder individually. C-Bar's corporate form does not change the fact plaintiff was so involved in C-Bar's operation she was akin to its alter ego and any loss to C-Bar was, essentially, a loss to plaintiff.

¶ 46 Moreover, the parties agree there is no potential for a double recovery because C-Bar cannot file suit for the injury to its sole shareholder. See *Castle v. Williams*, 338 Ill. App. 3d 708, 711, 788 N.E.2d 421, 423 (2003) (finding the "common-law right of a master to recover for loss of services due to a servant's injury by a negligent third party" was no longer a viable cause of action in Illinois). Given the fact C-Bar cannot recover for loss of services or profits due to defendant's negligence, if we were to bar plaintiff from recovering her lost earning capacity, defendant would receive a windfall, as no person or entity would be able to recover for the quantifiable damages incurred that were the direct result of defendant's negligence. Such a result would be contrary to the long-standing public policy in favor of compensating tort victims for all damages which naturally flow from the commission of the tort. See *Kritzen*, 226 Ill. App. 3d at 557, 589 N.E.2d at 921.

¶ 47 Accordingly, we reject defendant's argument. We therefore reverse the trial court's decision to direct a verdict and remand for a new trial based solely on the issue of plaintiff's lost earning capacity.

¶ 48 In conclusion, we hold evidence of the lost profits of a corporate entity are relevant to the determination of an individual's lost earning capacity regardless of whether the (1) corporation is a C corporation or subchapter-S corporation, and (2) plaintiff receives a salary or wages from the corporation, when, as here, (1) the corporation is closely held by the individual, (2) the individual's intellectual and physical labor is the predominant factor in earning its profits, and (3) no risk of double recovery exists.

¶ 49 III. CONCLUSION

¶ 50 For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 51 Reversed and remanded.